# COMPLAINT OF DISCRIMINATION

The defendants injured me when they promoted the clerk at the New Boston Plant, and the newly hired clerk at Mystic Station and I did not get a promotion even though I am the senior clerk.

Due to a fall on the job my right hip, back and shoulder was injured. I was out of work 1 1/2 weeks when the defendant sent a threatening letter indicating that my job would be terminated unless I come back to work on Monday.  Prior to that the defendant ordered me to see a third doctor because she didn't believe my absence was attributed the fall.  She chose her own doctor and scheduled an appointment for me. I honored her request and went to her doctor.  The defendant forced me to come into work during my illness and suspended me for unauthorized absence. This took place prior to the results or the doctor report. The doctor's report stated that my absence was justified because the fall caused more pain and suffering due to the pre existing problems.

I was injured when the Defendant sent me to cover the Medway clerk's job due to her long term Illness and refuse to pay me in full for mileage.  I covered that job for more than a year.  I should have been made permanent but the Defendant terminated the job while I was on disability 2004.

The continuous harassments and abuse resulted into migraine headaches, stress, depression and High Blood Pressure as well as lost of hair.  My character has been defamed.  As a result of all of this I also had to seek Profession Counseling two days per week to help me cope with the mental cruelty and agony I was experiencing.

These acts are still being committed against me.

# HARRISEMENT HISTORY

My name is Carrie Perry-Griffith. I have worked for Boston Edison and Sithe Mystic for 24 years in the position of clerk. Ten of those years I served as a station clerk at the Mystic Station. I am the senior station clerk for Sithe being the only minority in that position.

Prior to January 2, 2001, I have maintained a good work record. Since January 2, 2001, I have been suspended three times over a three-month period.

Prior to the hiring of an additional station clerk my job duties included preparing time sheets for the following: watch engineers, maintenance department, electrician department, water & steam lab department. My responsibilities also included typing vendors purchase orders, vendors vouchers, and entering vendor's invoice into Quick Book. This I performed under the supervision of Gloria Peterson, Administrative Assistant, and Timothy Bedard, Station Manager beginning in 1990. There was no complaint regarding my work during that time. Timothy Bedard and Gloria Peterson often complimented me for my outstanding work performance. Gloria on many occasions received telephone calls from several different vendors informing her of my professional ethics. I have never had a problem working with other employees. My attitude and lifestyle has been a very positive influence on those whom I have worked for and with. I have never disregarded nor disrespected those that are in authority. I have held high regards for management. No one that I have ever worked with or communicated with can ever state that I am neither rude nor arrogant or have ever heard me use profanity, even though I hear profanities often used by some management. When Sithe hired an additional station clerk, my work including my computer ID and password were taken away (computer ID and password have since been returned). My job

duties changed.  I was informed that Laura Marshall was hired to assist me, yet I am assisting her at the present.  I have become an object of ridicule.  My ability to make any contributions at work have been devalued to the point that it has affected my self-esteem.  I am constantly publicly berated.   Being the victim of verbal abuse and harassment has greatly affected the attitudes of supervisors who work in my area toward me.  The behavior of Karen Greig, Sithe Human Resource Director, Timothy Bedard, Sithe General Manager, and June Ducas, Sithe Office Assistant has become so outrageous and unprofessional that it has become apparent to me that I am being forced out of my job because of race, age and disability.

Timothy Bedard had promised that I would be trained on new company procedures and programs, unfortunately, that was never carried out. None of the clerks have been trained on SAP.  Management was trained on SAP and at the present are the only users of SAP.  Dona McGuire sent an e-mail giving instruction on how to get into SAP if there were a need. August 2000, Laura was moved from the front office, which is referred to as the "White House" into the office with me located inside the station.  Laura expressed her unhappiness that she had to share the same office with me.  She said that she liked having her privacy. She wanted a partition to separate us.  Laura tried everything she could to avoid sharing the same office with me. Many of her provocative comments I totally ignored.  One day I cracked open the window and she shouted, "Close that window!  When I refuse to close it she went to June.   June's attitude concerning the window was in Laura's favor.  Every opportunity June got she would use it to cause conflicts between Laura and me.  I over

heard June tell Laura that just because I am the senior clerk does not mean anything here. You do not have to talk or associate with her. She told Laura that she would be better off if she had nothing to do with me at all. June established a very good working rapport with Laura to the extent that they spent quite an unusual amount of times laughing, and talking. Whenever June had issues with me she expresses them in a loud manner. Soon after June and Laura went into her office to discuss issues as a result of my being yelled at by June. In September 11, 2000, John Cloutier, Union Local 369 Chief Steward at Sithe Mystic spoke with June Ducas concerning training me to work on "Quick Book", an invoice program for inputting vendors paid bills. He explained to her that this work is part or the clerks job specification. Mr. Cloutier came to me after he had spoken to Mrs. Ducas and stated that Mrs. Ducas was not at all happy with that suggestion, and it was indicated to him that I was pushing the issue. She also stated that the Quick Book program that I was familiar with which I learned at Medway was quite different from the Quick Book program that was presently used and time was not allotted to train me. On the following day Mrs. Ducas informed Mr. Timothy Bedard that Mr. Cloutier had spoken to her concerning training me to perform the work on Quick Book. When Mrs. Ducas left Mr. Bedard's office she appeared very unhappy. She ran into her office and slammed the door and immediately called Laura Marshall into her office. When Laura returned to her desk she informed me that Mrs. Ducas was very upset that she was asked to train me and she was trying to cool her down. After this incident the verbal abuse became frequently. This harassment became more severe and racism became more obvious.

On September 13, 2000 as soon as Mrs. Ducas came to work she came to my desk with a

4

hand full of invoices and threw them on my desk "here take these and let me see what you can do since you claim you know about Quick Book". While she was still standing at my desk I logged onto the Quick Book program and began entering the invoices the way I knew Quick Book. She yelled at me, "that's not how you enter them"! You must use the tab key she stated. I used the mouse that worked for me. I came to a point where the vendor invoice and the vendor account did not match. The hard copy indicated the **fixed** code and the computer indicated **variable**. I had never had this problem before, in that case I had to asked Mrs. Ducas for help. After I explained the problem to her she told me to just put them aside. When I get time I will help you. I am just too busy to answer your questions. She didn't seem too busy to help Laura, nor converse with others.

Three weeks had gone by, a tremendous backlog had occurred. When I went to her she got very angry and started shouting and yelling at me, "get away from me! Go find something else to do! You can't remember anything any way! "There are plenty other things you can find to do without pestering me! "Go do some filing". She humiliated me in front of everyone. Then she ran into her office and Laura followed. When Laura returned to her desk, she stated that June was upset because I kept asking to be trained, and she do not have time and also she is not feeling well because her son is in the hospital. I never received the training and she also refused to answer any questions I would ask. It finally occurred to me that I was not going to get any assistant from June, so I called Lisa Jerome, New Boston clerk. June got extremely angry that I called Lisa and started accusing me of making too many personal phone calls. She used the work as a mechanism to discredit me

and make me look incompetent by allowing it to backlog. Karen Greig, Timothy Bedard, and June Ducas have created a very hostile work environment. Several times I have gone to Timothy Bedard about June Ducas harassment and verbal abusive behavior, and he has refused to intercede. He never made an attempt to diffuse and correct the problem. As an illustration of how hostile my work environment has become, in March 2001 June claimed I was humming while I worked and I got suspended for **insubordination**.

I went to the ladies room when I returned to my desk where upon June came running screaming and yelling to the top of her voice and shaking her finger at me saying "I want you to tell me whenever you leave your desk, you think you are smart. I will suspend you for insubordination". Every time I leave my desk, I have to report to June where I am going. Laura does not have to tell June when she leaves her desk. She is free to roam whenever and where she pleases. I am 55 years old, and have to get permission to leave my desk even to go to the ladies room.

A few mornings I called to check on my husband who was recuperating from major surgery. On each occasion I used my portable telephone. I did not spend a tremendous amount of time on the phone. June accused me of using the Company's phone and company's time to make personal phone calls. I do not use the company's phone except for Company business. I have observed other employees who use the company phone for personal reasons. I received a call regarding a bill and June ran out of her office verbally accusing me of making personal calls for the purpose of ridiculing her. Calls occasionally come in from vendors to supervisors and accounts payable and I answer them.

6

Because of the influence June has shown, it has greatly affected Laura's attitude, thus causing rudeness on Laura's part against me. She would harass me and deny me information such as my payroll time sheet and the watch schedule for the month. She ordered me to shut my radio off, while continuing to play hers. She said I was forcing my religion on her because I played my radio on a religious station. When I didn't shut my radio off, Laura became very upset. Her only recourse was to complain to June Ducas. This problem only became obvious due to Laura's complaint. June's radio was played by her; the only difference was the kind of music.

In January 2001 I received e-mail from June stating that radios were not to be played in the office. I complied with her request and removed my radio from the office. Radios have since been played throughout the work force.

One January 25, 2001 I picked up a watch schedule from Laura's desk and began to look it over. When Laura returned, it appeared that she didn't approve of my being at her desk. She rudely told me you could take it! I asked if she could give me a copy each time she prepared them. She didn't approve and became defensive. "If I remember I will give you one, but if I don't remember I guess you won't get one". We began talking back and forth. I said, "Laura don't be silly. Laura became very hostile at my comment, which sparked a whole new series of negative reactions.

After the dispute was over, June Ducas came into the office and called Laura into her office and closed the door. Neither June nor Timothy questioned me as to what happened. Later I learned that June accused me of using profanity to Laura. She wrote me a note and stuck it

on my desk requesting that I write her my description of the incident (as she called it) and

give it to her immediately. (See Note).

I spoke with James Jones, Chief Steward for Union Local 369 concerning this and he

instructed me to comply. My written statement was neither accepted by June nor Timothy.

June used my statement to write her own. She did not witness the altercation between Laura

and me. Someone made her aware that we were a disagreement. June capitalized on the

quarrel and used it as an opportunity to retaliate. She never made an attempt to diffuse and

correct the matter. She used this to justify Laura's behavior and as an opportunity to keep

Laura and me from getting along. Timothy and June quickly suspended me the next day

January 26, 2001 after they had brought Laura into the office and behind closed doors

compared notes. I was suspended for this as well for **(unprofessional conduct in the work**

**place and verbal abuse to an employee)**. Laura Marshall did not get suspended. She only

got a verbal reprimand. This is discrimination. (Local Union 369 ruled that this suspension

couldn't stick due to the fact that I was suspended and Laura Marshall was not).


# 3 Suspension occurred on March 7, 2001. June Ducas said I was humming while I was

working in the files in her office. She said she told me to stop and I refused. While

I was in the files June unintelligibly began yelling at me. I looked around not knowing what

was going on, I kept working in the files. She started yelling again. I grabbed my papers

and started out of her office. I didn't understand what she was saying. She ran to the phone

and picked up the receiver and yelled, "Get out of my office". I returned to my desk called

for a Union Steward. After I could not locate a steward, I began to input what information I

had into the computer. I waited for a few moments and then I started back to the files. June

started yelling once again and said, "Don't you come back into my office!  "I do not want

you back in here until after I talk to the steward. Then she went to Timothy and told him,

he said I don't know what to tell you. She said "I don't care what you do with her I want her

out of here".  I went to inform Timothy. He was on the telephone. I finally got his

attention. I told him June had ordered me out of her office while I was getting information

from the files to input. He listened for a moment, said ok. He got back on the phone. He

did absolutely nothing about it.  June went and got Steve Bycoski, Steward for Union Local

369. After he met with June and Timothy he came and told me that June and Timothy want

to see me in the Conference Room.  At this point my curiosity was over whelming. I

walked into the Conference Room, June started yelling at me, "Don't come in here with

that smirk on your face". She said I am suspending you for "**insubordination**". You were

humming and I asked you twice to stop, and you were also asked to leave my office and you

did not when asked. Once again I experienced another humiliating suspension from

Timothy & June. I was asked to leave the Sithe property without given a chance to say

anything. I was devastated to the extent that I reminded Timothy that the two of us had

experienced a good work relationship over the years some how I felt he knew I was not that

kind of person. How could you be so cruel to me? I also told him that I thank God that I

still have my integrity, and he will have to answer to God for this behavior. (Local Union

369 stated that since the Company did not follow proper procedure this suspension is

arbitrated).

9

June Ducas has since been humming. On March 28, 2001 she was humming while I was in her office filing. Again on 4/10/01 June hummed as she walked back and forth from her office to the fax machine which is in my office. I do not believe humming is a violation.

Prior to all of these suspensions Union Local 369 representatives held meetings John Cloutier and Kevin Emery in October 2000 and November 2000 I met with Timothy and June for the purpose of correcting the unprofessional behavior as well as the harassment and verbal abusiveness in the office. They reminded Timothy that the harassment, verbal abuses against me still exists. They inquired as to why Timothy had not confronted June to try and correct such behavior. They also made him aware that June had not trained me on her Quick Book program. He said he would have me trained if I needed it, but he maintained that there was not a problem with June's behavior. So the harassment, verbal abuse, as well as the racism continue. Whenever I leave my desk to go to the bathroom I have to tell June. For not informing her of my biological needs I have been yelled at accompanied with the shaking of finger in my face. The inconsistency takes place when my co-worker is not under the same restrictions. I am an adult, a 55-year-old woman, I have never heard of such. To me this is discrimination.

My first suspension occurred on January 2, 2001 due to a fall on the job, which took place November 17, 2000 Karen Greig summoned me back to work and told Gary Lytle, Chief Maintenance Supervisor to suspend me. A letter from Karen Greig on January 3, 2001 confirmed that my suspension was for **"unauthorized absence"**. Due to Karen improper procedures and the fact that she did not wait for a third doctor's report that ruled that the

absent from work was correct due fall , which enhanced my preexisting

problem as well as injured other body parts.   I finally received my Workman

Compensation.  (The AFL-CIO Local Union 369 stated that this suspension has since been

expunged from my records).   (see attachments)


Due to a backlog of invoices which June Ducas had been holding while I was out on

disability and was still holding since I returned to work, Karen Greig had a meeting where

she brought in Bill Carr as mediator.  Some of the backlog was held due to retaliation.

There is no job specification for my job.  No one knows what job I perform.  I explain that I

have been working on Quick Book.  I have the basic knowledge of the Quick Book program

from information I gathered from various places.  I am not familiar with June's Quick Book

procedures.  June called me into her office a few minutes prior to the meeting with Bill

Carr, Karen Greig, Timothy Bedard and Susan Young and explained all the questions I had

tried to get answered since September 2000.   I had problems with that program which could

have been resolved with just a yes or no answer.  Because June had a vendetta she did not

want to give me any information.  She complained about my work but she was never

specific, and never took out the time to show me what I did wrong nor tell me what to do to

resolve the problem.  Prior to that day I received zero support from June and she allowed

the work to backlog and tried to hold my disability as responsible.

The pain and suffering Karen Greig, Timothy Bedard, June Ducas and Laura Marshall have

put me through the last two years has affected me physically and mentally.  I have suffered

hair loss. I am an arthritic; I have been forced to walk long distance to get to my work place

11

because I cannot climb the stairs. Timothy Bedard has been asked by the Local 369 to move me to the first level for easier access to my job, but he refused to comply. They have marred my character, but thank God I still have my integrity. The negative behavior I have experienced will be with me for the rest of my life. My prayers are that no one white, black, red or yellow will ever have this experience.

When Sithe first purchased the plants from Boston Edison they had a difficult time deciding on the name to use. They started out with Sithe Northeast, then Sithe Energies. The three plants they purchased in Massachusetts at one point was given the name Sithe Mystic LLC, Sithe New Boston LLC and Sithe Medway LLC. Some of the letterhead and forms are still bearing those names.

Gloria Peterson had taken my 15-minute break and combined it with my 30-minute lunch, which allowed me 45-minutes for lunch. Mrs. Ducas didn't seem to have a problem with that arrangement because she had never mentioned that there was a problem to September 2000 . The day that she claimed that I return from lunch late is not true. She did not inform me that she had changed the time prior to the meeting with John Cloutier. She did all of this as a vendetta because she did not want to train me on Quick Book.

November 7, 2000 I went to lunch at 1:05 P.M. I returned at 1:33 P.M. June had an issue because she made a mistake as to what time I left for lunch and return. Before I could take my jacket off and set at my desk she started yelling at me "You think I am playing with you, your lunch hour is a half an hour and you came back late; you left here at 5 minutes to 1:00 P.M. & you returned at 1:35. The next time you come back late I am going to write you up

12

and have you suspended". She ran back in her office and slammed the door without giving

me the opportunity to clarify.  Timothy went and checked the gate sheets and found that

I came back before my lunch was over and I always checked out and checked in with my

card.  You may contact John Cloutier at (617) 381-2326. & Kevin Emery at (617) 381-2399

or 2320.

The Respondents' report is a scenario made up of a sequential of concocted false

accusations arriving at terminating me from my employment at Sithe.  I do hope that this

case will be given the utmost scrutiny in its investigation to find Sithe guilty as charged.

# ACCIDENT REPORT

## *Sithe New England*
## Supervisor's Supplementary
## Accident Investigation Report

If accident involves lost time, advise GENERAL MANAGER immediately by telephone.

| Report of Investigation On: | Employee: | Carrie Perry-Griffith | Employee No.: 742676 |
|---|---|---|---|
| ☒ Personal Injury | Department: | Sithe Mystic | |
| ☐ Motor Vehicle Accident Vehicle Number: | Accident Date: 11/17/00 | | Supplementary-<br>-Report Date:    11/20/00 |
| | Lost Time?    ☐ Yes    ☒ No | | |

Describe in your own words exactly **What, Where, When** and **How** the accident happened.
(Essentials of a good investigation may be found in Safety Policy No. 4) (SP-4)

On Friday afternoon November 20th at approximately 1400 hours as I was walking from my office to the copying machine in the Administration Area of the station, I passed the clerk's offices and Carrie called me saying she had just fallen on the floor.

Upon entering the office I observed Carrie rising from the floor behind her desk. Laying on the floor beside her was her chair on its right arm rest.

Carrie stated that as she was moving from her desk area on the chair and rolling back and to her left the chair tipped over to her right. She was repositioning herself to work on a side table to the left hand side of her desk. She said that she hit her right elbow, hip and shoulder. She was rubbing her elbow and said she had some pain in it.

An inspection of the chair did not reveal any structural or wheel problems. The chair was equipped with rubber wheels that all were in good condition. The floor was clean and free of any foreign material that could have caught a wheel. I then sat in the chair and tried it. I rolled freely and seemed stabile. It did not tip when tried. The only thing I observed was Carrie's pocket book which was on the floor under her desk. I don't believe this entered into the accident because it did not show any sign of being dirty or tire tracks.

Carrie then stated that she thought the chair may be tilted and uneven and that it may have been the cause of the accident. Again I tried the chair and did not feel the unevenness. The chair has been removed and replaced.

... ...~ ............... ......., ... result of an unsafe act?  ☐ Yes  ☒ No    By Whom:   -

Action Taken: As a precaution the chair was changed.

Unsafe Conditions?   ☐ Yes   ☒ No   Conditions Corrected:

Date Report Reviewed with Emp.  11/22/00  Supv. Signature _____  Supv. Emp. No.044869

To be recorded on OSHA Log   ☐ Yes   ☒ No

cc:    K. Greig
       G. Peterson
       J. Reid
       J. Sheeley

# THIRD DOCTOR'S REPORT

# FACSIMILE COVER PAGE

Date:       1/10/01
Time:       8:14:30
Pages:      10

To:         Karen Greig
Company:    Sithe
Fax #:      381-2211

From:       Steve Mahoney
Title:      Quality Analyst
Company:    MES
Address:    850 Boylston Street  Suite 100
            Chestnut Hill ,  MA  02467
            US
Fax #:      617-277-9277
Voice #:    617-277-6788

Message:

Please note that this report has been dictated, but not read.  The original signed
report will be mailed to you shortly, following the doctor's final review and signature.
If you have any questions please fell free to call me at 617-277-6788.

Thank you

Steve

**WILLIAM KERMOND, M.D.**
850 BOYLSTON STREET, SUITE 100
CHESTNUT HILL, MASSACHUSETTS 02167
TELEPHONE (617) 277-6788
TELECOPIER (617) 277-9277

AMERICAN BOARD DIPLOMATE, ORTHOPAEDIC SURGERY

January 9, 2001

Sithe
173 Alford St.
Charlestown, MA 02129

Attention: Ms. Karen Greig

Re:   Ms. Carrie Perry-Griffith
      File #              114607
      S.S. #              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
      Date of Incident - November 17, 2000
      Employer -         Sithe Mystic, L.L.C.

Dear Ms. Greig:

At your request, Ms. Perry-Griffith was seen for an independent
medical evaluation on January 9, 2001 regarding her multiple right
shoulder and other right-sided injuries.

Prior to the evaluation, it was explained to the examinee that this
appointment was for purposes of evaluation only - not for care,
treatment or consultation - and therefore, no doctor-patient
relationship would result.  The examinee has also been advised that
I am an independent doctor and I am conducting this evaluation at
your request.

## OCCUPATIONAL DESCRIPTION AND WORK HISTORY WITH SITHE MYSTIC, L.L.C.

Ms. Perry-Griffith informed me that her occupational title at the
time of the injury was that of a clerical office worker/operator.
She related that her job involved the following duties: Office work
with typewriter, computer and copier.  The lifting requirements
were large binders with paperwork.

Ms. Perry-Griffith commenced employment with Sithe Mystic in
December 1976, and indicated that a pre-commencement physical
examination was performed and x-rays were not taken.  She commenced
employment with no restrictions imposed.

Page 2

Re: Ms. Carrie Perry-Griffith
File No.: 114607

## HISTORY OF PRESENT INJURY

Ms. Perry-Griffith  was injured on November 17, 2000 at 2:00 p.m.
when a chair flipped at work over and she injured the right side of
her body including her shoulder, hip, elbow and back.  She has been
out of work since November 17, 2000 until December 4, 2000 and then
was given an extension notices of out of work by the company doctor
and her own primary care physician, Lisa Owens, M.D. at Brigham and
Women's Hospital.  She received notice to return to work on January
2, 2001.  She did so and was suspended.  During this period of time
from November 17, 2000 until January 2, 2001, she received no
workers compensation benefits.  Five days after the injury she went
to Brigham and Women's Hospital emergency room and was seen, had x-
rays, and given medications of pain relievers and muscle relaxants.
This occurred on November 24, 2000.  It was Dr. Owens who suggested
she not return to work until December 8, 2000.  Ms. Perry-Griffith
did return to work on January 2, 2001 at the request of the
company.

## PRESENT COMPLAINTS

Ms. Perry-Griffith presently complains of pain located in her right
shoulder and right knee.  It is constant, of an aching, severe
nature.  The pain remains in these areas.  Nothing particularly
makes it better or worse.

## PRESENT TREATMENT

She is presently having therapy at Spaulding Rehab in Brighton with
therapy to her right shoulder, elbow, hip and back.  She is going
twice per week.  The treatment is helping.  She started this on
December 12, 2000.  Medications include pain relievers and muscle
relaxants.  She is taking medication for hypertension.  She related
that her present treating physician is Dr. Lisa Owens at Brigham
and Women's Hospital.

## ADDITIONAL INJURIES

She had a previous motor vehicle accident in 1991 from which she
fully recovered.

## PAST MEDICAL HISTORY

Page 3

Re: Ms. Carrie Perry-Griffith
File No.: 114607


She suffers from hypertension and her hypertension medication had
to be increased after this recent accident.  She has not been
hospitalized other than for surgery.  She has had previous injury
to her back, but never received physical therapy or chiropractic
treatment previously.  She has no allergies.  She rates her general
health as good except for her present pains.

## PHYSICAL EXAMINATION

This 55-year-old, right-handed female was 5 feet, 2 ½ inches in
height and weighed 155 pounds.

### EXAMINATION OF THE UPPER EXTREMITIES

Ms. Perry-Griffith complained of tenderness at the neck right
shoulder.

## Range of Motion of the Upper Extremities

|                            | Right  | Left   | Normal |
|----------------------------|--------|--------|--------|
| **Shoulder**               |        |        |        |
| Flexion                    | 140°   | 180°   | 180°   |
| Extension                  | 40     | 50°    | 50°    |
| Abduction                  | 80°    | 180°   | 180°   |
| Adduction                  | 50°    | 50°    | 50°    |
| External Rotation          | 45°    | 90°    | 90°    |
| Internal Rotation          | 40°    | 90°    | 90°    |
| **Elbow Joint**            |        |        |        |
| Extension                  | 0°     | 0°     | 0°     |
| Flexion                    | 140°   | 140°   | 140°   |
| **Elbow Joint Rotation**   |        |        |        |
| Supination                 | 80°    | 80°    | 80°    |
| Pronation                  | 80°    | 80°    | 80°    |
| **Wrist**                  |        |        |        |
| Dorsiflexion (Extension)   | 60°    | 60°    | 60°    |
| Palmar Flexion (Flexion)   | 60°    | 60°    | 60°    |

Page 4

Re: Ms. Carrie Perry-Griffith
File No.: 114607

| | | | |
|---|---|---|---|
| Ulnar Deviation | 30° | 30° | 30° |
| Radial Deviation | 20° | 20° | 20° |

## Muscle Strength

### Shoulder Girdle

Muscle strength of the elevator, depressor, protractor and
retractor on the right 4/5.

### Shoulders

Muscle strength of the extensor, flexor, abductor, adductor,
external rotator and internal rotator was 4/5 on the right.

### Elbows

Muscle strength of the extensor and flexor was normal bilaterally.

### Forearms

Muscle strength of the supinator and pronator was normal
bilaterally.

### Wrists

Muscle strength of the extensor and flexor was normal bilaterally.

### Hands

Muscle strength of the thumb abductor, intrinsic and pinch was
normal bilaterally.

### Joint Stability

There was no instability noted in the sternoclavicular,
acromioclavicular, shoulder, elbow, wrist, thumb or finger joints.

### Grip Strength

Grip strength was measured using the Jamar Dynamometer with
measurements taken and listed below.  Dominant hand is the right.

Page 5

Re: Ms. Carrie Perry-Griffith
File No.: 114607

| <u>Right</u> | <u>Left</u> |
|------|------|
| 40 | 80 |
| 35 | 85 |
| 35 | 80 |

A good effort was exerted by this individual, and grip strength on the right side was limited due to right shoulder pain.

## Girth Measurements

Girth measurements of the upper extremities were equal.

## Neurological Examination

Deep tendon reflexes (biceps, triceps and brachioradialis) were 2+ and symmetric bilaterally.

## Vascular Examination

The skin was normal bilaterally in texture, color, temperature, hair growth and nails. Radial pulses, thoracic outlet (Adson) and Allen test were also normal bilaterally.

## Shoulder Tests

Impingement test is positive on the right.

## EXAMINATION OF THE BACK AND LOWER EXTREMITIES

## General Observations

Weight-bearing was reduced on the right. Gait was antalgic on the right. Walking on toes and walking on heels was normal. She was unable to do hopping and squatting was limited.

No scars were noted. There was no evidence of muscle spasm or swelling.

There was no tenderness over the paraspinal muscles, buttocks (sciatic notch), trochanters, thighs, calves, spine, sacrum, sacroiliac joints, coccyx, iliac crest or on pelvic compression.

## Range of Motion of the Back

Page 6

Re: Ms. Carrie Perry-Griffith
File No.: 114607

|  | Range of Motion | Normal |
|---|---|---|
| Flexion | 60° | 60° |
| Extension | 25° | 25° |
| Lateral Flexion – Right | 20° | 25° |
| Lateral Flexion – Left | 20° | 25° |
| Rotation – Right | 25° | 30° |
| Rotation – Left | 25° | 30° |

## Range of Motion of the Lower Extremities

|  | Right | Left | Normal |
|---|---|---|---|
| **Hip** |  |  |  |
| Flexion | 45° | 100° | 100° |
| Extension | -10° | 30° | 30° |
| Internal rotation | 5° | 40° | 40° |
| External rotation | 5° | 50° | 50° |
| Abduction | 20° | 40° | 40° |
| Adduction | 15° | 20° | 20° |

Ranges of motion of the knees and ankles were within normal limits.

## Neurological Examination

Straight leg raising (seated) was 80° on the right and 90° on the right. Straight leg raising (supine) was 35° on the right and 60° on the left.

Laségue's test, cross straight leg raising and Patrick's test (FABERE) were negative bilaterally. Deep tendon reflexes (patellar and achilles) were 2+ and symmetrical bilaterally. Babinski's sign was negative.

## Waddell Test

Tenderness, light touch was appropriate. Simulation (axial loading and rotation) was appropriate. Distraction, SLR (seated) was appropriate. Regional disturbances and overreaction were also appropriate.

## Vascular Examination

Pulses (dorsalis pedis, posterior tibial, popliteal and femoral) were normal bilaterally.

## Muscle Strength of the Back and Hips

Page 7

Re: Ms. Carrie Perry-Griffith
File No.: 114607

<u>Back</u>

Extensors and lateral flexors were normal bilaterally.

<u>Abdomen</u>

Muscle strength of the abdomen (upper and lower) was normal
bilaterally.

<u>Hips</u>

Flexors, extensors, abductors, adductors, external rotators and
internal rotators were decreased on the right at 4/5.
Trendelenburg and Thomas' test (hip flexion contracture) were
positive on the right.

**<u>Knee Examination</u>**

Examination of the knees revealed no evidence of scars, redness,
swelling, effusion, increased heat or tenderness.  Popliteal space,
patella tracking and patellar mechanism were normal bilaterally.
There was no crepitation upon extension, flexion or grinding
(patellar).

**<u>Knee Joint Stability</u>**

Joint stability was normal in medial, lateral, anterior drawer,
posterior drawer, slocum test, anterolateral, posterolateral,
Lachman test and pivot shift.

**<u>Knee Tests</u>**

Quadriceps inhibition test, patellar apprehension test, McMurray
test and Apley test were negative bilaterally.

**<u>Measurements</u>**

Linear measurements were equal bilaterally.   Girth measurements
revealed 6" knock knees.

**<u>COMMENTS AND CONCLUSIONS</u>**

Diagnosis/Impression      1.   Multiple injuries to the right side of
                               her body after she tripped over a

Page 8

Re: Ms. Carrie Perry-Griffith
File No.: 114607

> chair. These include contusion of her
> right shoulder (?rotator cuff tear),
> low back strain, exacerbation of pre-
> existing degenerative arthritis of her
> right hip, contusion of her right
> knee.

Ms. Perry-Griffith was seen by her primary care physician, Dr. Lisa Owens, during her therapy and it was suggested that she stay out of work until January 8, 2001. She was, however, apparently summoned back to work by her place of employment on January 2, 2001 and suspended. She continues on physical therapy.

The positive and objective findings are that Ms. Perry-Griffith has a limitation of motion of the right shoulder with an abnormal rhythm of motion in which the glenohumeral component supercedes the scapular/thoracic component, giving an abnormal rhythm of motion to the shoulder and limitation of full abduction. This is frequently seen with a rotator cuff tear. She has limitation of motion of her back, but her most objective findings are in relationship to her right hip where she has limitation of motion in all directions and almost certainly represents an exacerbation of symptoms from a degenerative arthritis of her hip.

In addition, Ms. Perry-Griffith has a contusion of her knee and has 6" of knock-knee, which I presume is a congenital phenomena rather than due to any direct injuries to her knee, although again no x-rays were available for review.

Her subjective complaints are of pain in her shoulder, back, groin on the right side and in the right knee on the outer side. In my opinion, the positive and objective findings substantiate the subjective complaints and are consistent with the injuries describes. There are no inconsistencies.

Duration of disability – on-going from the date of injury to the present. She is not at an end result. Further treatment recommended would be further investigation in the form of an MRI of her right shoulder and plain films of her right hip and knee. Re-evaluation should be done should any surgical intervention be performed. Based on her statements, I believe there is a causal relationship between the present disability and the incident described.

In my opinion, the incident does represent aggravation at least of the pre-existing, underlying condition of degenerative arthritis of

Page 9

Re: Ms. Carrie Perry-Griffith
File No.: 114607

her right hip, which may require surgical intervention. I believe
that the pre-existing underlying condition of her hip is the major,
predominant cause of her present disability. I believe there is a
substantially greater disability by reason of the combined effects
of the previous impairment and the subsequent injury described than
that disability which would have resulted from the subsequent
injury alone. I do not believe that there is any evidence of pre-
existing problems with her right shoulder. I believe that it is
most likely that the pain in her knee is referred pain from her
hip, but if x-rays of her knee have not been taken, I believe that
this should be done particularly in view of the large degree of
vagus deformity of her right knee. Finally, should any additional
information become available for my review, I would be happy to
issue an addendum to this report.

Thank you for the opportunity of evaluating Ms. Perry-Griffith. If
you have any further questions, please do not hesitate to contact
me.

The opinions herein are certified under the penalty of perjury this
_____ day of _____, 2001.



William Kermond, M.D.
Diplomate, American Board
of Orthopaedic Surgery

# REFERENCES



173 Alford Street Charlestown, MA 02129

Tel : 617 . 381 . 2200
Fax : 617 . 381 . 2211

December 20, 2000

Ms. Carrie Perry-Griffith
63 Crawford St.
Apt. 3.
Dorchester, MA 02121

Dear Carrie:

Information provided by Dr. McEleney indicated you were to report back to work on Wednesday, December 20, 2000. You did not return to work nor have I heard from you regarding your whereabouts. This is considered to be unauthorized absence. If I do not hear from you by the end of business on Thursday, December 21, 2000, I will consider you have abandoned your position at Sithe and therefore your employment will be terminated.

Once again you are required to call me and or Timothy Bedard with your home telephone number. I can be reached at 617-381-2351.

Sincerely,

Karen L. Greig
Director – Human Resources

**Sithe**

173 Alford Street Charlestown, MA 02129

Tel : 617 . 381 . 2200
Fax : 617 . 381 . 2211

November 28, 2000

Ms. Carrie Perry-Griffith
63 Crawford St.
Apt. 3.
Dorchester, MA 02121

Dear Carrie:

In order to evaluate your illness, an appointment has been scheduled with Dr. McEleney at St. Elizabeth's Hospital.  Your appointment is scheduled for Thursday, November 30, 2000 at 10:00 am.

Also, I have no record a your home telephone number and am instructing you to call me with the number.

I can be reached at 617-381-2351.

Sincerely,

Karen L. Greig
Director – Human Resources

 **Sithe**

*173 Alford Street Charlestown, MA 02129*

Tel : 617 . 381 . 2300
Fax : 617 . 381 . 2311

December 28, 2000

Carrie Perry-Griffith
63 Crawford Street
Apt. 3
Dorchester, MA  02121

Dear Carrie:

As I have previously explained, Dr. McElhaney notified us that you were able to report for work on Wednesday, December 20, 2000.  Therefore, we consider you to be on an unexcused, unpaid absence.  An explanation of your benefit-continuation rights under COBRA will be sent to you shortly.

Your entitlement to Workers Compensation will be determined accordance with the procedures provided for under the Workers Compensation law.

Lastly, as you have been instructed many times you must provide the Company with your home telephone number so that we can communicate with you when necessary.  Should you fail to do so before 5:00 p.m. on Friday December 29, 2000, we will begin your termination process.

Sincerely,

Karen L. Greig
Director-Human Resources

cc:  John Riley

BO:52395.1



# LOCAL 369, UWUA, AFL-CIO



## GRIEVANCE FORM

# PRODUCTION & MAINTENANCE WORKERS

**All grievances handled by Stewards, up through Department Heads (as provided for in Article XXVIII, Section 2 and 3) for which a satisfactory answer is not received, should be filed at the Union Office.**

Date: **06/11/02**

Name of Steward (s) involved **Kevin Gregor**

Name of aggrieved member (s) **Carrie Perry-Griffith**

Dept. **Operations**                    Division _____

Job Title **Station Clerk**        Grade _____        Location **Mystic Station**

Date of inception of Grievance **March 12, 2002**

Company officials contacted  **June Ducas Karen Grieg**

(Be sure that the corresponding names are in the right places)

Under Article 28-2: **June Ducas**

Date: **6/11/02**

Under Article 28-3: **Karen Grieg**

Date: **6/11/02**

Article (s) of Contract violated: **Article XII Par. 8 (b)**

Description of Grievance: **Carrie Perry-Griffith is required to report to work at Medway Station two (2) times per week. She has been attempting to collect the contractual mileage allowance as provided for under Article XII Par 8 (b), which states that "no mileage shall be payable in connection with travel between any Company facility and the employee's home." What the Company has been doing with her travel compensation is to subtract the mileage from her home to Mystic Station, eight (8) miles)), from the distance from her home to Medway Station, (twenty eight and one half (28.5) miles, allowing her a total compensation of twenty one (21) miles. The actual distance from Mystic Station (her scheduled work location), and Medway Station is thirty two (32) miles, which would allow for a contractual allowance of sixty four (64) miles round trip, instead of the forty two (42) miles that they are currently paying her. Carrie mentioned to me that she has brought this to June Ducas' attention. She told her that she could not authorize this, and that she would refer it to Karen Grieg. Carrie told me that the response she got from Karen Grieg was to "grieve it".**

**The remedy requested is to make Carrie whole in lost back travel monies, stemming from 3/12/02, and to start paying her the contractual terms outlined in the above mentioned article.**

Steward (s) Signature (s)

*Production & Maintenance Workers' Local No. 369*

# UTILITY WORKERS UNION OF AMERICA

120 BAY STATE DRIVE    •    BRAINTREE, MA 02184

(781) 848-3740        (781) 848-3741

FAX (781) 848-4108

74

July 1, 2002

Ms Karen L. Greig
Director Labor Relations
Sithe New England
173 Alford Street
Charlestown, MA  02129

RE:  <u>P&M GRIEVANCE #6573 - FAILURE TO PAY PROPER MILEAGE
     ALLOWANCE FOR CARRIE PERRY-GRIFFITHS.</u>

Dear Ms Greig:

The Local contends the Company to be in violation of Article XII and other pertinent and relevant articles of the Collective Bargaining Agreement between the parties dated October 1, 2000.

This violation occurred on March 12, 2002, when the company failed to pay Ms. C. Perry-Griffiths the proper mileage when traveling to Medway for company business.

Responsible officials of the Local contacted J. Ducas and K. Greig designated by the Company to handle grievances under the provisions of Article XXVIII (3).  A satisfactory adjustment could not be reached.

The Local's remedy for settlement of this grievance is that the Company cease and desist this contractual violation and make Ms. Perry-Griffiths whole for all lost wages and benefits, including overtime.

The Local requests that a conference be held under the provisions of Article XXVIII (4) and will be represented by C. Perry-Griffith, K. Gregor, J. Jones, Executive Board Member K. Emery and Business Agent J. Riley.

Very truly yours,

Gary P. Sullivan
Secretary-Treasurer

GPS/eh

cc:    K. Emery        J. Jones        T. Bedard